No. 92-614

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

IN RE THE MARRIAGE OF

RICK A. MAEDJE,

>Petitioner and Appellant,

and

KIM A. MAEDJE,

>Respondent and Respondent.

APPEAL FROM: District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

>For Appellant:

>>Thomas W. Trigg, Attorney at Law,
>>Missoula, Montana

>For Respondent:

>>Neil M. Leitch, Attorney at Law,
>>Missoula, Montana

Submitted on Briefs: October 28, 1993

Decided: February 1, 1994

Filed: FEB 01 1994

FILED

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Appellant Rick A. Maedje petitioned the District Court for the Fourth Judicial District in Missoula County to dissolve his marriage to Kim A. Maedje. A trial was conducted by a Special Master in December 1991, and a decree of dissolution was entered by the District Court on June 25, 1992. The court distributed the marital estate based on the Special Master's recommended findings of fact and conclusions of law. Rick's motion to amend the decree was deemed denied pursuant to Rule 59(g), M.R.Civ.P. From the decree and denial of his motion to amend, Rick appeals.

We affirm in part and reverse in part.

The issues on appeal are restated as follows:

1. Were the court's findings regarding the increase in value of the Inyokern property during the parties' marriage clearly erroneous?

2. Did the court err in its distribution of the marital estate?

Rick and Kim Maedje were married on June 8, 1989, in Salt Lake City, Utah. A petition for dissolution was filed by Rick on April 30, 1991. At the time of trial, Rick was 52 years old and was employed as a pilot for Sky West Airlines. He had worked as a commercial pilot for over 20 years. Kim was 34 years old at the time of trial and had previously worked as a horse trainer and grocery store checker. No children were born during the parties' 22 month marriage.

Both Rick and Kim had previously been married and each brought substantial real and personal property into the marriage. Among those assets were Rick's properties located in Tehachapi and Inyokern, California, and Kim's interest in property located in Caliente, California. Prior to their marriage, Rick and Kim resided together at Tehachapi and then lived at Inyokern during part of 1989 and 1990, where Kim conducted a horse training and boarding business.

During their marriage, the parties sold the Tehachapi, Inyokern, and Caliente properties, and purchased two pieces of property in Montana: 28 acres located on Nine Mile Road near Huson, and the Blue Bird Mobile Home Park in Hamilton. The Nine Mile property was purchased with proceeds from the sale of the Inyokern property in March 1990. In April 1991, just prior to their separation, the Hamilton property was purchased with proceeds from the sale of the Tehachapi property and a loan secured by the Nine Mile property.

At trial, a Special Master for the District Court valued the marital estate based primarily on testimony from the parties and their experts. After adopting the Special Master's recommended findings of fact and conclusions of law, the District Court apportioned the marital estate and entered a decree of dissolution on June 25, 1992. The court awarded Kim the tangible personal property she brought into the marriage and the proceeds from the sale of the Caliente property. Rick was awarded his premarital

3

personal property, two undeveloped parcels of real property, and his retirement account and shares of Sky West stock. These property distributions are not challenged on appeal.

At issue in this appeal are the court's valuation of the appreciation of the Inyokern property during the parties' marriage, and its allocation of the increased value realized from the sale of both the Inyokern and Tehachapi properties.

The court found that the value of the Inyokern property as of the date of the parties' marriage was $96,000 and that it was sold ten months later for $125,000. Therefore, the court concluded that the property had increased in value by approximately $29,000 during the time the parties were married. The court also found that the Tehachapi property was appraised in November 1988 at $171,000 and sold in February 1991 for $250,000. The court determined that this represented an increase in value of approximately $3000 per month, and concluded that the property increased in value by $58,000 from the date of the marriage to the date the property was sold. The court specifically found the following with respect to these increases in value:

> Although there was considerable testimony submitted that Kim is and has been a hard worker during the marriage, it is highly probable that neither Kim nor Rick's improvements to property may have significantly contributed to the increase in value during the course of the marriage. Rather, it appears that the increase was primarily attributable to appreciation.

The court concluded that the parties should share equally in the increased value in these two properties and determined that an

4

equitable division of property would be to award Kim the Nine Mile property, valued at $55,000, free of all encumbrances. The court stated that this reflected "her contributions to the marriage and her portion of the increase in value of both Tehachapi and Inyokern during the course of the marriage." Rick was awarded the Hamilton mobile home park and was ordered to pay the mortgage on the Nine Mile property which secured the outstanding loan on the Hamilton property.

Rick moved to alter or amend the judgment, but this motion was deemed denied on September 9, 1992. From the decree and the denial of the motion to amend, Rick appeals.

### STANDARD OF REVIEW

The distribution of the marital estate is governed by § 40-4-202, MCA. This statute vests the district court with broad discretion to apportion the marital estate in a manner which is equitable to each party under the circumstances. *In re Marriage of Rock* (1993), 257 Mont. 476, 850 P.2d 296; *In re Marriage of Collett* (1981), 190 Mont. 500, 621 P.2d 1093.

The standard of review employed by this Court in marital property division cases is whether the district court's findings of fact are clearly erroneous. *In re Marriage of McLean/Fleury* (1993), 257 Mont. 55, 849 P.2d 1012. When there is substantial credible evidence to support the court's findings and judgment, this Court will not alter the trial court's decision unless there is an abuse

5

of discretion.  *In re Marriage of Scoffield* (Mont. 1993), 852 P.2d 664, 50 St. Rep. 560.

I.

Were the court's findings regarding the increase in value of the Inyokern property during the parties' marriage clearly erroneous?

Rick contends that the court's findings in regard to the appreciation of the Inyokern property during the time that the parties were married is clearly erroneous.  Therefore, he asserts that the property distribution scheme, which is based in part on the Inyokern property's appreciation, is inequitable.

Rick does not challenge the court's methodology for calculating the appreciation of premarital property during the parties' marriage.  However, he contends that the figures used by the court to calculate the appreciation of the Inyokern property were purely speculative and are not supported by substantial credible evidence.

We agree with this contention.  The District Court's findings of fact numbered 23 and 24 address the valuation of the Inyokern property.  Those findings state as follows:

> 23.  Petitioner testified that he believed Inyokern's value as of June 1989 was $103,000. Respondent testified that Petitioner told her the property was worth between $85,000 - $90,000 as of June 1989.
>
> 24.  Averaging the values given by the parties, the Special Master recommends that the value as of date of

6

marriage be established at $96,000. Thus the increase in the value of this property from the date of marriage to the date of sale is approximately $29,000.

After reviewing the record, we conclude that there was no factual basis in the record for these findings. When Rick testified, he stated that he did not know the value of the Inyokern property in June 1989, but that he had sold ten acres of it for $105,000 in 1983. There is no indication what relationship that ten acres had to the 19.2 acres of Inyokern property which Rick brought into the marriage in June 1989. Although it is unclear whether a portion of Inyokern was actually sold or whether this was a lease option which ultimately fell through, there is no evidence that Rick stated that Inyokern was worth $103,000 in 1989.

Furthermore, when Kim was asked about the value of the Inyokern property in 1989, she gave the following answers to the following questions during the course of her testimony:

Q. (BY MR. LEITCH) Moving along here, Kim, regarding the Inyokern property, you state in the [proposed] Findings that in June of '89 it was valued at $85,000. Where did that figure come from?

A. That figure I had gotten from--and I think it is more of a guesstimation on the price that Rick wanted to sell it to the Hackers for. They lived right next door to us. And originally I had always heard--

MR. NEWCOMER: Objection, speculation.

THE COURT: Sustained.

. . . .

Q. Okay. But you said that it was valued at $90,000 by Rick, not $85,000?

7

A.    Well, it was speculation on our part. We thought 85 to 90 and that's how I feel about it. It is hard when you are not real estate agents, and we are not even talking about an appraisal here. We are talking about two people talking.

MR. NEWCOMER: Your Honor, I would object to this line of questioning as simply eliciting speculation as to value.

In other words, in order to arrive at the value of the Inyokern property at the time the parties were married so that it could determine the amount by which the property appreciated during the marriage, the court averaged a figure which it erroneously attributed to the testimony of Rick with a figure thrown out by Kim based on total speculation. The result was an average of $96,000, which has no factual basis in the record.

In *In re Marriage of Luisi* (1988), 232 Mont. 243, 756 P.2d 456, we stated that, when valuing the assets in a marital estate, the court is free to adopt any valuation of property which is supported by the record. However, in this instance the court's findings are based largely on speculation, and we have made clear that speculation, conjecture, inference, or guess do not constitute credible factual evidence. *Graham v. Rolandson* (1967), 150 Mont. 270, 435 P.2d 263.

We conclude that the court's findings were not supported by substantial credible evidence, and therefore, its calculation of the appreciation of the Inyokern property during the parties' marriage was clearly erroneous. The judgment of the District Court with respect to the valuation of the Inyokern property is vacated

8

and we remand this case to the District Court for a proper determination of the amount by which the Inyokern property appreciated during the parties' marriage.

## II.

Did the court err in its distribution of the marital estate?

Rick contends that the court erroneously awarded Kim the Nine Mile property as compensation for her share of the appreciation of Inyokern and Tehachapi because she did not contribute significantly to the appreciation of those pre-acquired properties which Rick brought into the marriage. He asserts that even if Kim did contribute to the value of Tehachapi, the court's award of half of the appreciation of both properties was disproportionate to the value of her contributions. Finally, he claims that the court should not have ordered him to pay the mortgage on the Nine Mile property because Kim testified that she would be willing to pay it if she were awarded the property.

Section 40-4-202(1), MCA, sets forth the factors which must be considered by the court before distributing property acquired before the marriage. That section provides in relevant part that:

> In dividing property acquired prior to the marriage . . .
> the court shall consider those contributions of the other
> spouse to the marriage, including:
>
> (a) the nonmonetary contribution of a homemaker;
>
> (b) the extent to which such contributions have
> facilitated the maintenance of this property; and
>
> (c) whether or not the property division serves as
> an alternative to maintenance arrangements.

9

In this instance, the record demonstrates that the court considered Kim's contributions to the marriage, including specific contributions she made to the properties in question. Based on testimony by the parties and other witnesses, the court found that Kim had made substantial nonmonetary contributions to the marriage. There was testimony that, among other things, Kim had remodeled and painted buildings on the parties' various properties, performed daily housekeeping activities, and kept the marital financial records. Furthermore, although a request for maintenance was made in the response to the petition for dissolution, no maintenance was awarded. Although the court found that the increase in the value of the Inyokern and Tehachapi properties "was primarily attributable to appreciation," it concluded that due to her contributions to the marriage, she was entitled to half of the appreciation in value of those properties.

Although the evidence does not indicate that Kim's contributions resulted in any significant increase in the value of the properties in question, the record does support the finding that Kim contributed in some fashion to the maintenance and appreciation of these properties. We conclude that this evidence supports the District Court's allocation of these assets according to the considerations required by § 40-4-202, MCA.

Therefore, we hold that the court did not abuse its discretion when it awarded Kim half of the appreciated value of the Inyokern and Tehachapi properties. Although Kim had stated that she would

10

pay the mortgage on the Nine Mile property, it was within the court's discretion to award her this property unencumbered as compensation for her share of the marital estate.

This case is reversed in part and remanded for a proper determination of the amount by which the Inyokern property appreciated during the parties' marriage. The distribution of the marital estate is affirmed subject to any adjustments necessary to reflect the corrected value of appreciation on the Inyokern property.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

11

Chief Justice J. A. Turnage concurring in part and dissenting in part:

I concur with the majority opinion on Issue 2. I respectfully dissent from the majority opinion on Issue 1.

The majority opinion reverses the District Court and remands this case for determination of the amount by which the Inyokern property appreciated during the parties' marriage. The majority opinion concludes that the District Court's findings of fact numbered 23 and 24, relating to the valuation of the Inyokern property, have no factual basis in the record and, therefore, are clearly erroneous.

With the exception of finding 23, in that the figure $103,000 should have been $105,000, findings 23 and 24 are not clearly erroneous.

A review of the record in this case is enlightening and clearly supports the findings of the District Court. The record consists of:

(1)  Over 1200 pages of transcribed depositions and trial testimony;

(2)  Over 70 exhibits introduced at trial;

(3)  Over 94 pages of discovery documents;

(4)  Two large district court files containing 122 separate filings of documents.

The setting of this conjugal war commenced on June 8, 1989, with the marriage of the parties and escalated commencing April 30,

12

1991, when the petitioner Rick Maedje (Rick) filed for a dissolution of his marriage to Kim Maedje (Kim). This marital war has continued for nearly three years and may well continue much longer now that the majority has reversed the District Court.

From a review of this record, it is readily apparent that the special master who presided in this case exercised the highest standards of judicial conduct and patience. The special master was faced with a most complex and difficult trial that consumed many judicial hours, three substitutions of counsel and involved parties that, charitably speaking, were on many occasions difficult.

The property that the special master was required to consider in arriving at an equitable distribution of the marital estate consisted of many items of personal property too numerous to mention and six parcels of real estate located in California and Montana, each of which had a substantial value that needed to be determined.

The majority of this Court reverses and remands this case, thereby prolonging the marital conflict for an indefinite period of time. The sole reason is the majority's conclusion that there is no factual basis in the record to support the master's findings of a value, as of June 8, 1989 (the date of the parties' marriage), for a parcel of land of approximately twenty acres located in Kern County, California, and the amount of its appreciation during the marriage of the parties. This Court is asking a new trier of fact

13

to perform an impossible task in trying to establish a value for this parcel of land nearly five years after the marriage.

It is apparent from the record that Rick was determined to avoid testifying concerning the value of the Inyokern property as well as to values of other property to be considered in the marital estate. An example of Rick's avoidance of offering evidence of values of properties is his response to an August 13, 1991 order of the court requiring the parties to set forth an inventory of the property involved in the marital estate and the values thereof. By Document 37 in the District Court file, Rick's response states an inventory of all property owned by the parties jointly or separately. Rick lists eighty-three separate items of property, including the Inyokern property, and states for his response to the court that the value of each of the said eighty-three items is to him "unknown."

The special master's Conclusion of Law No. 6 states: "The value of the gross marital estate is approximately $520,385. The debt against this estate is approximately $167,000, resulting in a net marital estate of $353,385."

The special master in Conclusion of Law No. 9 stated that the value of the Inyokern property increased approximately $29,000 from the date of marriage to the date of sale and that the parties should share equally in the $29,000 increase in value. Therefore, the special master awarded $14,500 of the increase to Kim. The

14

majority of this Court now finds that there is nothing in the record to substantiate this conclusion of law. I disagree.

There is no dispute in the record that the Inyokern property sold on March 26, 1990, for $125,000; $55,500 was paid as a down payment and the balance of $69,500 was received by Rick in the form of a note and deed of trust. Rick's Exhibit 1-B-4.

Transcript Volume III, Page 50, sets forth Rick's testimony on direct examination concerning this sale:

Q. So then in 1990 did you sell the Inyokern property?

A. Yes.

Q. Okay. And when did you put it on the market?

A. It was in the early winter, I believe.

Q. Okay. And it sold March 26, 1990?

A. Yes.

Q. And about how much did you receive? How much did you receive for it?

A. The selling price was 125,000.

This testimony not only sets forth the sale of the property for $125,000 on March 26, 1990, but also provides testimony from the owner of the property upon which the court can draw a lawful inference that this property was placed on the market in the early winter of 1989-90. Therefore, by inference in October 1989, some four months after the marriage, Rick must have placed a value of at least $125,000 on this property because it sold for that sum in March of 1990. Most certainly the buyer did not offer to pay more

15

than the asking price. From this sale, Rick has been receiving $736 a month on the unpaid balance. (Transcript Volume III, Page 162.)

Rick's Exhibit 9 establishes that he had agreed to sell the Inyokern property for $105,000 in 1983 but that the sale failed in 1985. Transcript Volume V, Page 136, sets forth the question directed to Rick by the court and his response. This portion of the transcript tells us that Rick did at this time put a value on Inyokern and the value was $105,000. Undoubtedly the court's erroneous figure of $103,000 in its findings should have been $105,000.

Rick's testimony establishes that he therefore did put a value on that property which the court could use as an inference of value when he had offered no other assistance to the court in providing a June 8, 1989 value. In response to a question from the court, Rick testified, Transcript Volume V, Page 136:

> Q. Can you tell me the value of the Inyokern property as of June 1989?
>
> A. The only thing I can go on there is I had sold ten acres of it with the main barns and the corrals and arena and mobile on it for 105,000 to Lloyd and Beverly Hacker (phon.) in 1983 and that's the only value that I could put on it. [Emphasis added.] [Note that this is the sale which failed.]

Kim testified as to a value of the Inyokern property, a value that she had obtained from Rick, the owner of the property. This testimony and the testimony of Rick provides substantial credible evidence upon which the court arrived at a value of the Inyokern

16

property and the increase in value during the marriage. This evidence supports the court's findings 23 and 24 whereby the court averaged the $90,000 value given by Kim with the testimony given by Rick that the value was $103,000 [sic] and subtracted that amount from the $125,000 sale price, arriving at an increase in value of $29,000.

Kim testified on direct examination concerning the value of the Inyokern property, Transcript Volume IV, Pages 153-55:

> Q. Okay. And in June of '89 did Rick tell you what he thought it was worth?
>
> A. Yeah, approximately.
>
> Q. And how much was that?
>
> A. Approximately 85 to 90,000 is what we thought it would sell for. Both of us. It was both of our impression that it would be right around that, that that would be its selling price, once it was--
>
> Q. Was it then sold in April of 1990?
>
> A. Uh-huh.
>
> Q. And do you know how much it was sold for?
>
> . . .
>
> A. I believe it was 125. I think that this is wrong, the 120. That should be--
>
> Q. Sold for 120 to 125,000?
>
> A. Yeah.
>
> Q. Okay.
>
> A. I think we put the low ends on--both 85 and 120 here. It looks that way to me.

17

Q. Okay. Assuming it was sold for $90,000—or excuse me, it was valued at $90,000 by Rick in June of '89 and then sold for 125,000 in 1990, March, what sort of an increase in value would that give us?

A. Well, it would be 35, and then split in half, it is 17,5.

Q. Okay. but you said that it was valued at 90,000 by Rick, not 85?

A. Well, it was speculation on our part. We thought 85 to 90 and that's how I feel about it. It is hard when you are not real estate agents, and we are not even talking about an appraisal here. We are talking about two people talking.

MR. NEWCOMER: Your Honor, I would object to this line of questioning as simply eliciting speculation as to value.

THE COURT: I think she has been asked and answered this same question.

MR. LEITCH: I think so, too. I am responding to the objection. I think it is an admission against interest and I think under the Rules of Evidence it comes under what he valued the property at at that time.

THE COURT: Well, I will overrule the objection, but move on, because I think that information is in.

The record in this case is not a perfect example of how property should be valued and appraised; however, it does provide the court a substantial credible record upon which to base the findings of fact and the conclusions of law. It must be remembered that the court is responsible for providing an equitable distribution of the marital estate, and such was accomplished in this case.

This case will soon be three years in duration. It has consumed countless hours of court time, involved five different

18

lawyers resulting from three substitutions of counsel, and attorney liens filed against both Rick and Kim.

The amount involved in this case in view of the totality of the property is minimal. The court's erroneous finding of $103,000 as the value set in Rick's testimony when the value should have been $105,000, is of a trivial nature when viewed in light of the significant amounts of property in this case and therefore does not warrant any remand or reversal on that point. A reversal and remand undoubtedly will result in prolonged District Court litigation and, in all probability, further appeal to this Court. The time has now arrived to bring to a conclusion the marital war between Rick and Kim. I would affirm the District Court.

_____
Chief Justice

Justice James C. Nelson:

I concur with the concurring and dissenting opinion of Chief Justice Turnage.

_____
Justice

Justice Karla M. Gray:

I concur with the concurring and dissenting opinion of Chief Justice Turnage.

_____
Justice

19

February 1, 1994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


THOMAS W. TRIGG
Attorney at Law
210 North Higgins Ave.
Missoula, MT 59802

NEIL M. LEITCH
Attorney at Law
336 Ryman Ave.
Missoula, MT 59802

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy